## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BARBARA BRASHER,                         :
        Plaintiff,                  :          CIVIL ACTION
                              :          No. 13-4103
           v.                        :
                              :
THOMAS JEFFERSON                         :
UNIVERSITY HOSPITALS,                    :
INC.,                                    :
        Defendant.                  :

December 22, 2015                                              Anita B. Brody, J.

### MEMORANDUM

Plaintiff Barbara Brasher brings this lawsuit against Defendant Thomas Jefferson University Hospitals ("Jefferson"). Brasher alleges violations of the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act ("PHRA") arising from her employment as a registered nurse ("RN") at Jefferson and the hospital's decision to fire her.[1] Jefferson now moves for summary judgment (ECF No. 47), and for the reasons stated below, I will grant its motion for summary judgment.

### I.        BACKGROUND

Brasher is a 52-year-old RN. She began working at Jefferson's Emergency Department in January 2009. ECF No. 48, Ex. A (Brasher Dep.) at 11. Prior to starting at Jefferson, she had 26 years of nursing experience. *Id.*

---

[1] I exercise jurisdiction under 28 U.S.C. §§ 1331 and 1367.

A.  <u>Brasher's Disciplinary History at Jefferson</u>

Jefferson maintains a progressive employee disciplinary program with four steps. Under this system, an employee whose performance is unsatisfactory is initially given a "First Written Warning," which involves a "discussion between the employee and the supervisor concerning the employee's infraction or . . . failure to meet performance standards." ECF No. 54, Ex. A (Employee Disciplinary Procedures). If the employee's behavior continues to be unsatisfactory, she is given a "Second Written Warning," which consists of "a formal notice to the employee that rules, policies, or procedures have been violated." *Id.* Third, an "employee may be suspended from work for a serious infraction of Jefferson's rules, for failure to do assigned work properly, or after written disciplinary warnings." *Id.* The final step in Jefferson's disciplinary procedures is termination, the conditions for which "depend on the individual circumstances and the seriousness of the offense, overall record of service, and the number of warnings." *Id.* Jefferson's procedures also allow a supervisor to skip one of the progressive disciplinary steps "in instances of serious violations of policy and/or procedures, or where there are repeated violations of policy and/or procedures." *Id.*

Over the four years of her employment at Jefferson, Brasher was the subject of several disciplinary actions and complaints, primarily related to her documentation in two computer systems: JeffChart and WellSoft.[2] On September 10, 2009, she was placed on a Formal Employee Action Plan ("the Plan") after several complaints were received about her documentation, including "[o]rders not signed out in JeffChart," "[o]rders completely missed," "[n]o documentation of pain scores," and generally "[i]ncomplete documentation and care." ECF

---

[2] WellSoft was used for "nursing assessments," while JeffChart was utilized for medication orders. Brasher Dep. at 176. Brasher attended a "hospital-wide, department-wide orientation to WellSoft" and a "department-specific[] JeffChart" training. *Id.* at 174, 176.

No. 48, Ex. K (Formal Employee Action Plan). As a part of the Plan, Brasher was to be given additional educational resources, including JeffChart training. *Id.* The Plan stated that if there were further clinical care issues, Brasher would "be placed into the formal disciplinary process." *Id.*

On January 25, 2012, Brasher received a First Written Warning for violating Hospital Policy #113.35,[3] which relates to documentation. ECF No. 48, Ex. O (First Written Warning). On April 25, 2012, Brasher was suspended without pay because she violated Hospital Policy #109.05, which requires nurses to renew their licenses five business days prior to the expiration date. *See* ECF No. 48, Ex. Q (Conference/Anecdotal Record). On August 1, 2012, Brasher received a Second Written Warning for violating Hospital Policy #113.35. ECF No. 48, Ex. J (Second Written Warning). This second warning indicated that Brasher had entered "multiple free typed nursing notes that contained unapproved abbreviations, grammatical and spelling errors which led the chart to be very unclear. This type of charting violates hospital policy # 113.35."[4] *Id.* The Second Written Warning stated that if an incident occurred again, Brasher could face termination. *Id.*[5]

During this period, other nurses committed disciplinary infractions but received relatively light punishment. In particular, an RN identified as "Jiji" was asked to hang an antibiotic intravenous ("IV") bag on a patient going into surgery, and accidentally hung heparin, an anticoagulant, instead. As a result, the surgeon had to halt the operation. Jiji was written up, but

---

[3] A copy of this policy was not included in the record.
[4] "Free typing" or "free texting" is the use of freely typed notes in WellSoft and JeffChart, instead of the provided templates, to enter patient data. ECF No. 48, Ex. B. (Bosley Dep.) at 41.
[5] More generally, Brasher's performance evaluation for the period between July 1, 2011 and June 30, 2012, recognized that she took "extra measures to ensure patients/customers are responded to quickly," but also noted that she had "difficulty in organizing thoughts and articulating needs through her charting." ECF No. 48, Ex. L (Performance Evaluation). The evaluation explained that she frequently did "not use the provided templates, which ma[de] her documentation unclear and hard to understand." *Id.*

not terminated, for her error. *See* Brasher Dep. at 162-63; *see also* ECF No. 54, Ex. D (Rocco Dep.) at 54 (recalling this incident). Additionally, several nurses mistreated Brasher without facing discipline. For example, she testified that a nurse "berated [her] and screamed and yelled at [her]" for failing to take a manual blood pressure on a patient, when in fact she had done so. Brasher Dep. at 166. A nurse's aide, Kim Golumbiewski, ignored Brasher completely and refused to assist her. *Id.* at 158. Rey Olivio, another RN, was rude to her and made several threatening remarks to her about having her work done. *Id.* at 159. Olivio also improperly tried to remove a homeless woman from the emergency room, allegedly in violation of the Emergency Medical Treatment & Labor Act ("EMTALA"), and Brasher stepped in to prevent him from doing so. *Id.* at 104. Frank Rocco, the Nurse Manager, investigated Brasher's complaints about Olivio's alleged EMTALA violation, but Olivio was not disciplined. Rocco Dep. at 46-50.

B. <u>JIIP Incident and Termination of Employment</u>

At the beginning of her shift in the Emergency Department on January 16, 2013, Brasher was informed that a diabetic patient would likely be transitioning to a Jefferson Insulin Infusion Protocol ("JIIP"). Brasher Dep. at 300. A JIIP is a specific type of insulin therapy for diabetic patients, and Jefferson's protocols state that once a JIIP is ordered, "all other insulin orders . . . [are] discontinued." ECF No. 48, Ex. T (JIIP Procedures). Once a physician orders a JIIP, the hospital pharmacy prepares and releases the insulin, and two RNs must verify the IV type and dose as well as each change in rate. *Id.* The JIIP Procedures also require RNs to document rate changes using a particular calculator in JeffChart. *Id.*

At approximately 9:36 a.m. on the morning of January 16, Brasher started the diabetic patient on an insulin infusion of 10% dextrose ("D10") solution. *See* ECF No. 48, Ex. Z (January 18 Horneff Email); Brasher Dep. at 318. A written order for a JIIP was not entered into JeffChart

until 1:10 p.m. that afternoon. Once the order was entered, Brasher did not stop the insulin infusion she started that morning or change the insulin bag because the "previous insulin bag [was] still hanging." ECF No. 48, Ex. X (JeffChart Screenshot) (showing JIIP order at 1:10 p.m. and Brasher's note that the insulin was "[n]ot [g]iven"). Brasher also did not have a second nurse witness her administration of the insulin or the changes in the rate at which the insulin was administered throughout the day, as required by hospital policy. Additionally, she did not use the correct insulin rate calculator, and, as a result, her calculations did not transfer to the patient's medical chart in JeffChart. *See* January 18 Horneff Email; ECF No. 48, Ex. W (Brasher Email); Brasher Dep. at 344-45.

Randy Horneff, the Nursing Administrative Liaison, initially reported this incident to Jenny Bosley, the Emergency Department's Clinical Nurse Specialist. In his report, Horneff indicated that Brasher had not initiated the 1:10 p.m. JIIP order and had failed to properly document, or have a second nurse witness, the administration of the insulin. *See* ECF No. 48, Ex. BB (January 16 Horneff Email). The following day, Bosley emailed Horneff and Rocco. She stated that Brasher needed "to be written up for this" because Brasher's conduct was "dangerous" and was "both a clinical care issue and a documentation issue." ECF No. 48, Ex. BB (Bosley Email).

On January 17, 2013, Brasher was placed on indefinite suspension pending investigation of her actions. On January 18, 2013, Horneff emailed Rocco about the incident. He claimed that Brasher had administered the D10 insulin infusion at 9:36 a.m. without a doctor's order. He also stated that, once the order had been entered at 1:10 p.m. that afternoon, Brasher failed to implement the JIIP protocol by switching the insulin bag. *See* January 18 Horneff Email. Finally, he noted that the calculator Brasher used "didn't cross over [to JeffChart] and essentially there

was no documentation for the drip or any titrations she made during her shift." *Id.* Brasher

emailed Rocco that same day to explain her actions. According to her version of events:

> I paged green team[6]. I was told do not change [the insulin rate] and he
> would send his intern down . . . . Around 0930 the team was still no[t]
> there, I spoke with [G]len[7] outside of room 36. Informed him I was
> concerned for the blood sugar was dropping and no one got back to me
> regarding fluid rate. I told him on the protocol it noted I could hang D10 at
> 50 cc/hour. Glen stated yes hang the D10 and he would clarify with green
> team. I also obtained the D10 from [the pharmacy] who sent it to me via
> the tube system. They asked what it was for I told them gave them that
> patients name and they sent it to me. [T]he fluid was hung via pump and
> the green team was again paged. [A] female resident arrived I explained
> what was happening . . . .

Brasher Email. While Brasher agreed that she used the wrong calculator and forgot to have a

second nurse witness her actions, she stated that she was simply following the instructions she

was given by the nurse on the prior shift. *Id.*[8]

MaryAnn Wallace, the RN who took over Brasher's patient, also emailed Rocco. She

stated that the "in house residents were not returning [Brasher's] pages for fluid orders" and that

Brasher "went to Rob in pharmacy to help her with the IVF changes." ECF No. 48, Ex. BB

(Wallace Email). With respect to the documentation, she noted that Brasher was unaware that

she was using the wrong calculator and "thought the calculator would automatically transfer the

information she was putting in to JeffChart." *Id.* She did, however, indicate that Brasher came in

to work early the following day "to go over the documentation for the JI[I]P." *Id.*

Ultimately, after hearing Brasher's version of events and receiving input from other

hospital staff, Rocco communicated to his supervisor that termination was appropriate because

---

[6] The green team is one of the teams of physicians at the hospital. *See* Rocco Dep. at 127.
[7] Glen was a pharmacist at the hospital. *See* Brasher Dep. at 307.
[8] Later, at her deposition, Brasher stated that a green team resident named Neha told her to hang the D10
infusion on the morning of January 16, 2013, and that the resident instructed her to leave the same bag
hanging once the order was entered at 1:10 p.m. *See* Brasher Dep. at 305, 309, 316.

Brasher "gave a medication without a Physician order," failed to have "2 RN's sign off on the medication," and made these mistakes "with such a high-risk medication." *See* ECF No. 48, Ex Y (Rocco Email). He also noted that this was "not Ms. Brasher's first incident with poor documentation." *Id.* When he informed Brasher that she would be terminated, she resigned instead. No one was hired to replace her. *See* ECF No. 48, Ex. DD (Interrogatory Responses) at 4.

   C.   Procedural History

   Brasher unsuccessfully appealed her termination through Jefferson's internal grievance procedure, and then filed a complaint with the EEOC and the Pennsylvania Human Relations Commission. On July 15, 2013, she commenced this lawsuit. In her First Amended Complaint, she alleged claims of unlawful discrimination and unlawful retaliation under the ADEA. *See* ECF No. 13, at 8-9. On October 23, 2013, Jefferson moved to dismiss the complaint. *See* ECF No. 15. On April 17, 2014, I granted Jefferson's motion to dismiss with respect to Brasher's ADEA retaliation claim without prejudice to Brasher to amend her complaint; I denied Jefferson's motion with respect to the ADEA discrimination claim. *See* ECF No. 24. On May 8, 2014, Brasher filed a Second Amended Complaint. This complaint alleged two counts: unlawful discrimination under the ADEA and unlawful discrimination under the PHRA. *See* ECF No. 27. On April 9, 2015, Jefferson moved for summary judgment.  I heard oral argument on Jefferson's motion on December 17, 2015.

**II.    LEGAL STANDARD**

   Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . .

." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party.  *Id.*  In ruling on a motion for summary judgment, the court must draw all inferences from the facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After the moving party has met its initial burden, the nonmoving party must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.  Both parties must support their factual positions by: "(A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The materials in the record that parties may rely on include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).  In resisting a motion for summary judgment, the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

In essence, the inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**III.   DISCUSSION**

Brasher's only remaining claims[9] are for unlawful age discrimination under the ADEA and the PHRA. To prevail on an age discrimination claim under either the ADEA or the PHRA,[10] Brasher must "prove that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). The parties agree that the *McDonnell-Douglass* burden-shifting framework is the appropriate rubric to analyze Brasher's claim. *See Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) (concluding "that the but-for causation that *Gross* requires does not conflict with [the] continued application of the *McDonnell Douglass* paradigm in age discrimination cases"). Under the *McDonnell-Douglass* approach, Brasher must first establish a prima facie case of age discrimination. If she does so, the burden shifts to Jefferson to provide a legitimate nondiscriminatory reason for her termination. The burden then shifts back to Brasher to establish by a preponderance of the evidence that Jefferson's reason is merely a pretext for age discrimination. *See Smith*, 589 F.3d at 689-90.

---

[9] Brasher makes a belated attempt to raise a hostile work environment claim in her opposition to Jefferson's motion for summary judgment. *See* ECF No. 54, at 10-13. This claim was not pleaded in either the initial complaint or the two amended complaints Brasher has filed in this action. Nor has Brasher sought leave to further amend her complaint. Counsel "cannot reasonably expect to amend the complaint . . . merely by raising new arguments in the responsive papers" to the motion for summary judgment. *Speziale v. Bethlehem Area Sch. Dist.*, 266 F. Supp. 2d 366, 371 n.3 (E.D. Pa. 2003); *see also Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").

Brasher argues that she sufficiently raised a hostile work environment claim by including allegations of mistreatment by coworkers in her Second Amended Complaint. However, these averments were provided "[b]y way of example" to show that younger employees "were involved in activity that was much worse while still retaining their jobs." ECF No. 27, at 4. In context, these allegations were meant to illustrate disparate treatment and not a hostile working environment. Jefferson was not on notice that Brasher intended to present a hostile work environment claim based on the allegations in the complaint. Therefore, I will not address this eleventh-hour claim.

[10] The Third Circuit has held that identical standards apply to the ADEA and the PHRA. *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192-93 (3d Cir. 2015). Thus, the following analysis applies to both of Brasher's discrimination claims.

Construing the facts in the light most favorable to Brasher, she has still failed to demonstrate that there is a genuine issue of material fact as to whether Jefferson's decision to terminate her was pretextual. As such, Jefferson is entitled to judgment as a matter of law.

A. Prima Facie Case

In order to establish a prima facie case of age discrimination, Brasher must show "that she (1) is a member of the protected class, i.e. at least 40 years of age, (2) is qualified for the position, [and] (3) suffered an adverse employment decision." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 n.5 (3d Cir. 1998) (citation omitted) (internal quotation marks omitted). Additionally, where a discharged employee is not replaced, she must "show that [s]he was laid off from a job for which [s]he was qualified while other workers not in the protected class were retained." *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 342 (3d Cir. 1990); *see also Johnson v. Del. Cty. Juvenile Detention Ctr.*, No. 11-1166, 2012 WL 895507, at *5 (E.D. Pa. Mar. 16, 2002) (stating that this fourth element is established where "younger employees received comparatively more favorable treatment" (internal quotation marks omitted)). The prima facie case under *McDonnell-Douglass* "is not intended to be onerous." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995). A plaintiff need only "raise[] an inference of discrimination [that her employer's] acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Constr. Co. v. Waters*, 438 U.S. 567, 577 (1978).

Neither party disputes that Brasher, at age 52 and with 26 years of nursing experience, meets the first two elements of the prima facie case. Further, her termination from employment at Jefferson is undoubtedly an adverse employment action. *See Marzano v. Computer Sciences*

*Corp., Inc.*, 91 F.3d 497, 508 (3d Cir. 1996). Jefferson does, however, argue that Brasher has not demonstrated that her responsibilities were assumed by similarly situated younger employees.

In its response to Brasher's interrogatories, Jefferson stated that she was not replaced, but that her "former coworkers assumed [her] job duties and responsibilities." Interrogatory Responses at 4. Many of these coworkers were RN's who were at least five years younger than Brasher. *See* ECF No. 54, Ex. E (Kelly Dep.) at 21 (estimating that Rey Olivio was 45 years old in 2015); *id.* at 61 (noting that one RN was "in her early 30s" while another was in her "late 30s, early 40s"); Rocco Dep. at 38 (estimating that Jiji was 40 years old in 2015). This age difference is "sufficient . . . such that a fact-finder can reasonably conclude that the employment decision was made on the basis of age." *Sempier*, 45 F.3d at 729; *see id.* (noting that courts have found that "a five year difference can be sufficient" for purposes of the prima facie case). Further, at least one of these nurses, Jiji, administered the wrong medication to a patient going into surgery, but faced lighter punishments than Brasher. *Cf. Willis v. UPMC Children's Hospital of Pittsburgh*, No. 15-1526, slip op. at 13-14 (3d Cir. Dec. 22, 2015) (finding that plaintiff failed to make a prima facie case when there was "no evidence that anyone . . . committed these same infractions and escaped discipline").

Brasher's prima facie burden is not "onerous," and she has carried it here.

B. Legitimate Nondiscriminatory Reason

Because Brasher has established a prima facie case, the burden shifts to Jefferson to articulate a legitimate nondiscriminatory reason for its decision to fire her. This burden is "relatively light." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). All the employer must do is "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id.* The employer's burden

is one of production; "[t]he burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age." *Gross*, 557 U.S. at 180.

Both at the time of Brasher's discharge, and during the course of the litigation, Jefferson has articulated four reasons for the termination: (1) Brasher's administration of the D10 solution without a physician's order; (2) her failure to follow the physician's 1:10 p.m. JIIP order by replacing the insulin bag; (3) her failure to have a second nurse witness the administration of the insulin; and (4) her repeated documentation errors, including the failure to properly document the calculation of insulin rates on January 16. *See* ECF No. 48, Ex. Y (Rocco Email) (recommending termination because "[t]his is not Ms. Brasher's first incident with poor documentation," she failed to have "2 RN's sign off on the medication," she "did not follow protocols," and "she also gave a medication without a Physician order"); Interrogatory Responses at 5 (stating that Brasher was fired because she "failed to utilize the correct protocol in initiating" the JIIP, "administered medication to the patient without an accompanying physician order," "did not properly document her actions," "administered the medication . . . without a witness," and because this was her "third discipline within a 12-month period relating to following Hospital protocol").

These reasons, if "taken as true, would permit the conclusion that there was a nondiscriminatory reason" to fire Brasher. *Fuentes*, 32 F.3d at 763. Therefore, Jefferson has met its burden of production at the second step of the *McDonnell-Douglass* framework.

C.  Pretext

"In order to show pretext, a plaintiff must submit evidence which (1) casts doubt upon the legitimate reason proffered by the employer such that a fact-finder could reasonably conclude that the reason was a fabrication; or (2) would allow the fact-finder to infer that discrimination was more likely than not a motivating or determinative cause of the employee's termination."

*Doe v. C.A.R.S. Protection Plus*, 527 F.3d 358, 370 (3d Cir. 2008). Under the first method of demonstrating pretext, it is not enough to "show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer." *Fuentes*, 32 F.3d at 765. Rather, a plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* (emphasis omitted). The second way of proving pretext is satisfied if "(1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably." *Willis*, slip op. at 11.

In examining whether an employer's reasons are pretextual, a court must focus on "the facts as they appear to the person making the decision to terminate" a plaintiff. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000); *see also Bonefont-Igaravidez v. Int'l Shipping Corp.*, 659 F.3d 120, 125 (1st Cir. 2011) (rejecting plaintiff's pretext claim where he presented "no evidence that [the employer's] decisionmakers, made, or were even aware of, such comments at the time the decision to terminate was rendered"). "The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is" discrimination. *Willis*, slip op. at 16.

1.  *Alleged Inconsistencies in Jefferon's Reasons for Termination*

Brasher argues that Jefferson's proffered reasons for terminating her are pretextual because its account of the JIIP incident contradicts what actually transpired. Specifically, she claims that a physician authorized her to administer the D10 solution on the morning of January 16, 2013, and told her to not to change the insulin bag once a JIIP order was entered into JeffChart at 1:10 p.m. Although Brasher presented this version of events in her deposition testimony, *see* Brasher Dep. at 305, 316, the relevant inquiry is what her supervisor, Frank Rocco, knew at the time he recommended that she be terminated in January 2013.

At the time that Rocco decided to fire Brasher, he had received an email from Randy Horneff reporting that Brasher had administered a D10 insulin infusion without a doctor's order, had failed to change the insulin bag once the JIIP Order was entered, and had improperly documented the administration of insulin. *See* January 18 Horneff Email. Rocco also had access to the patient's JeffChart record, which indicated that a JIIP Order was entered at 1:10 p.m. but that the insulin bag was not changed. Additionally, MaryAnn Wallace's email to Rocco stated that "the in house residents were not returning [Brasher's] pages for fluid orders" and Brasher "went to Rob in pharmacy to help her with the IVF changes." Wallace Email.

Rocco also had an email from Brasher explaining her actions. In that email, Brasher stated that she (1) paged the green team and "was told do not change" the insulin rate, (2) told the pharmacist that "on the protocol it noted [that she] could hang D10," and (3) received insulin from the pharmacy. Then, "the fluid was hung . . . and the green team was again paged," after which a green team resident finally arrived. *See* Brasher Email. Notably, Brasher's contemporaneous email did not state that a resident authorized her to administer the D10 infusion prior to her hanging the bag, or instructed her not to change the insulin bag in the afternoon.

14

Indeed, based on the chronology that Brasher herself offered at the time, it appears that she was told not to change the insulin rate, but believed that the protocol allowed her to do so. While, construed in the light most favorable to Brasher, her email does suggest that the pharmacist approved her administration of the JIIP infusion, it is undisputed that the hospital's JIIP protocol requires a physician's order. Further, although Brasher noted that she was simply following instructions, she did acknowledge in her email to Rocco that she had failed to properly document the information in JeffChart and forgot to have a second nurse witness the administration of insulin. And Brasher's employee records, which were available to Rocco, clearly established that she had several prior disciplinary warnings related to documentation problems.

In short, based on the facts as they would have appeared to Rocco, his reasons for firing Brasher were not based on "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . . that a reasonable factfinder could rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 765. Even if a resident had told Brasher to administer the insulin and instructed her not to change the insulin bag—as Brasher maintained in her deposition—this only establishes that Rocco's decision was mistaken or that he should have conducted further investigation.[11] It does not create a genuine issue of material fact as to whether, at the time of Brasher's termination, Rocco's decision was motivated by discriminatory animus. *See Willis*, slip op. at 18 (holding that an employer's belief that plaintiff treated staff members inappropriately was not pretextual, even though she denied such behavior, in light of the plaintiff's employment record and complaints received from staff); *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d

---

[11] Jefferson contends that the resident's instructions to Brasher are inadmissible hearsay that cannot be considered at summary judgment. Brasher responds that these statements are not hearsay because they fall within the exclusion for opposing party statements under Federal Rule of Evidence 801(d)(2). Because the summary judgment record does not indicate that Rocco was aware of these alleged instructions at the time he decided to fire Brasher, I need not address this issue.

1253, 1266 (11th Cir. 2010) (noting that the pretext inquiry "centers on the employer's beliefs [and] . . . not on reality as it exists outside the decision maker's head").

    2.  *Treatment of Similarly-Situated Employees*

Brasher also attempts to demonstrate that discrimination was "more likely than not a motivating or determinative cause" of Jefferson's actions. *Willis*, slip op. at 11 (internal quotation marks omitted). Specifically, she argues that other younger nurses engaged in similar conduct but were given more lenient treatment.[12] The treatment of similarly situated individuals is relevant at both the prima facie and pretext stages of *McDonnell-Douglass*. *See Simpson*, 142 F.3d at 645. At the pretext stage, however, the plaintiff's burden is heightened because "the factual inquiry into the alleged discriminatory motives of the employer has risen to a new level of specificity." *Id.* at 646. In order to determine "whether similarly situated nonmembers of a protected class were treated more favorably" at the pretext stage, "the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action." *Id.* at 647. This "normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000); *see, e.g.*, *Willis*, slip op. at 21 (holding that a comparator's "abruptness and sarcasm [was] not the same as the use of profanity in close proximity to patients and their families"—the conduct for which the plaintiff was disciplined).

---

[12] Brasher does not argue that Jefferson previously discriminated against her or that the hospital discriminated against other nurses within the protected class. *See Willis*, slip op. at 11 (recognizing that such evidence satisfies the second method of showing pretext).

In her brief in opposition to summary judgment, and during oral argument, Brasher

identified Jiji, the RN who accidentally hung heparin on a patient going into surgery, as a

comparator. *See* ECF No. 54, at 5, 9. Jiji is not similarly situated to Brasher, as a matter of law,

because, unlike Brasher, there is no evidence that she had multiple violations of hospital policy.

Jefferson's disciplinary procedures state that a termination decision may be based on "the

seriousness of the offense, overall record of service, *and the number of warnings*." *See* Employee

Disciplinary Procedures (emphasis added). Jefferson's procedures also allow a supervisor to skip

one of the progressive disciplinary steps based on a consideration of a number of factors,

including not only "[t]he nature of behavior and the ramification . . . for patient care and safety,"

but also "[w]hether the behavior was an isolated occurrence or a pattern of conduct," and "[t]he

employee's past discipline, whether related to the same or similar behavior or not." *Id.* In short,

Jefferson's disciplinary procedures make an employee's disciplinary history a relevant factor for

the decision to terminate. Thus, even if Jiji's accidental administration of heparin was as high

risk[13] as Brasher's improper administration of insulin, Jiji is not similarly situated because there

is no record evidence that she had a similar disciplinary history as Brasher.[14]

---

[13] Brasher asks me to take judicial notice "that heparin is an anticoagulant" and that "there could have been seriously adverse (if not fatal) results" from Jiji's error. ECF No. 54, at 5 n.2. Judicial notice is reserved for facts "not subject to reasonable dispute" that are either "generally known" or can be readily determined "by resort to sources whose accuracy cannot reasonably be questioned." 21B Wright & Graham, *Federal Practice & Procedure* 2 (2d ed. 2005). I will not take judicial notice of the potential effects of heparin on a patient because they do not fall within this narrow definition of judicially noticeable facts.

[14] Even if Jiji were a valid comparator, the Third Circuit has indicated that "[a] decision adversely affecting an older employee does not become a discriminatory decision merely because one younger employee is treated differently." *Simpson*, 142 F.3d at 646. While Rey Olivio arguably engaged in multiple disciplinary infractions—including making rude comments to Brasher and improperly attempting to remove a homeless woman from the Emergency Room—such actions are not comparable to Brasher's documentation and verification errors with respect to medication.

Brasher has not "cast[] doubt upon the legitimate reason proffered by the employer such that a fact-finder could reasonably conclude that the reason was a fabrication" or that the employer was more likely than not motivated by discriminatory animus. *Doe*, 527 F.3d at 370. Therefore, her age-discrimination claim fails at the pretext stage of *McDonnell-Douglass*.

## IV.    CONCLUSION

Brasher has failed to establish that there is a genuine issue of material fact as to an essential element of her ADEA and PHRA claims: whether Jefferson's reasons for firing her were pretext for age discrimination. As such, Jefferson is entitled to judgment as a matter of law, and I will grant Jefferson's motion for summary judgment.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

O:\ABB 2015\A - K\Brasher v TJU Memorandum on MSJ v2.docx